IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| KEE GOOSTREE, as representative of the ESTATE OF ALTON H. PADGETT, and JEAN G. PADGETT, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 1:19-CV-00071-KOB<br>) |
| LIBERTY NATIONAL LIFE INSURANCE COMPANY and ROBERT D. BICE, | )<br>)<br>) |
| Defendants. | ) |

## **MEMORANDUM OPINION**

As Justice Hugo Black said in 1944, "Perhaps no modern commercial enterprise directly affects so many persons in all walks of life as does the insurance business. Insurance touches the home, the family, and the occupation or the business of almost every person in the United States." *United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533, 540 (1944). Today, insurance still provides the primary method by which individuals and businesses transfer the risk of loss to an insurance company that accepts the risk and distributes the cost of that risk of loss among a similarly situated group of insureds.

Life is uncertain. Death is certain. But when death will come knocking remains uncertain. To provide financially for our loved ones when death knocks, many people purchase life insurance policies. Like all insurance contracts, life insurance presents a gamble.[1] The insurance

---

[1] In "Europe in the fifteenth through seventeenth centuries, the frequent association of life insurance with gambling and other disreputable practices prompted governments to prohibit its practice without exception." *Sun Life Assurance Co. v. Wells Fargo Bank, N.A.*, 238 N.J. 157,

1

company bases its premiums on actuarial tables and gambles that the insured will live long enough for the company to collect premiums sufficient to at least cover—and perhaps exceed—the face amount of the policy. The insured makes a perverse gamble that he will die *before* he pays more in premiums than the face amount of the policy. But whenever the insured dies, the insured's beneficiaries receive the face amount of the insurance, regardless of how much or how little the insured payed in premiums.

In this case, Plaintiffs complain that Defendant Liberty National "won the bet" and collected more in premiums than the face amount of the policies that Plaintiffs purchased between 1972 and 2015. This result reflects the nature of the life insurance gamble. For this, and the other reasons explained below, the court will GRANT Defendant's motion to dismiss all counts. (Doc. 3.)

**I. Background**

Mrs. Jean Padgett and the Estate of Mr. Alton Padgett are the two named Plaintiffs in this lawsuit. Mr. Padgett died in May 2018 at the age of 88, and Mrs. Padgett is now either 82 or 83 years old. On October 19, 2018, Plaintiffs filed this suit individually and on behalf of all others similarly situated against Liberty National and Robert Bice, a Liberty National insurance agent, in the Circuit Court of Talladega County, Alabama. On January 11, 2019, Liberty National removed this case to federal court. Mr. Bice joined in the removal, and the court dismissed Mr. Bice from the action, finding the Plaintiffs fraudulently joined him to the suit. (Doc. 35.) Liberty National, the only remaining Defendant, now brings this motion to dismiss.

Plaintiffs generally contend that Liberty National engaged in a "common scheme of unlawful conduct . . . relating to the targeting and sale of low face value life insurance policies to

---

164 (2019) (quoting GEOFFREY CLARK, BETTING ON LIVES: THE CULTURE OF LIFE INSURANCE IN ENGLAND, 1695–1775, 13–14 (1999) (quotation marks and ellipses omitted).

lower income consumers." (Doc. 1-1 at 8.) Plaintiffs specifically allege that "Liberty National targeted consumers who are under-educated and/or unsophisticated with respect to insurance and related financial dealings, the language of the policies, and methods of determining premium payments whereby the premiums paid on such policies far exceeded the policy's face value." (*Id.*). The policies require Plaintiffs to pay premiums that, over time, exceed the death benefit value pursuant to the policy. According to Plaintiffs, the policies generated no-risk profits to Liberty National but provided no economic benefit to Plaintiffs.

The complaint states that Liberty National, through Mr. Bice, "knew and understood the Plaintiffs' age, employment, financial status, lack of dependents, and station in life." (Doc. 1-1 at 11.) For example, Mr. Bice knew that Mrs. Padgett was retired and receiving social security since 1998, and Mr. Padgett was earning less than $16,000 annually through his job at Piggly Wiggly. Mr. Bice recommended and induced the Padgetts to purchase multiple insurance policies, for which the premiums collectively exceeded $14,000 per year. Mr. Bice continuously represented to the Padgetts that "such additional insurance was financially appropriate and beneficial to Plaintiffs, consistent with Plaintiffs' profile, needs and financial situation" despite his knowledge that "each successive policy would cost more in premiums than the death benefit payable under the policy." (*Id.* at 11–12.)

Between 1972 and 2015, the Padgetts bought 15 life insurance policies from Liberty National: nine insured Mr. Padgett's life; five insured Mrs. Padgett's life; and one insured them jointly. Liberty National gave the Padgetts "free look" periods on these policies that allowed the Padgetts to cancel the contracts within ten days of signing. From 1972 to 2017, the couple had paid a total of more than $188,000 in premiums, yet the combined death benefit for all policies was approximately $45,000.

Based on this series of agreements with Liberty National, the Padgetts bring eight claims: count one is breach of contract; count two is breach of implied covenant of good faith and fair dealing; count three alleges conversion; count four seeks rescission; count five claims unjust enrichment; count six seeks declaratory and injunctive relief; count seven alleges negligence; and count eight asserts negligent training and supervision.

But two of the purported counts—rescission and declaratory and injunctive relief—present remedies, not causes of action. Rescission is an equitable remedy in which a court voids a contract and restores the parties to the position they were in before they signed the contract. *Clark v. Wilson*, 380 So. 2d 810, 812 (Ala. 1980). A claim for rescission cannot stand alone; a plaintiff must first provide a reason why the court should rescind the contract, such as unconscionability or fraudulent inducement. *See, e.g., Leonard v. Terminix Int'l Co., L.P.*, 854 So. 2d 529, 534 (Ala. 2002) (unconscionability); *Layne v. Garner*, 612 So. 2d 404, 408 (Ala. 1992) (unconscionability); *Exxon Mobil Corp. v. Alabama Dep't of Conservation & Nat. Res.*, 986 So. 2d 1093, 1129 (Ala. 2007) (fraud). Likewise, declaratory and injunctive relief are "prospective remedies" a court may grant a plaintiff *after* the plaintiff demonstrates at least one independent and meritorious cause of action. *McKinnon v. Talladega Cty.*, 745 F.2d 1360, 1362 (11th Cir. 1984). So the court need not consider the remedies sought in counts four and six because the court ultimately finds no cause of action survives Defendant's motion to dismiss.

**II. Standard of Review**

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint. The Federal Rules of Civil Procedure require that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P.

8(a)). A plaintiff must provide the grounds for his claims, but Rule 8 generally does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley*, 355 U.S. at 47). It does, however, "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertions" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.

The Supreme Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting and explaining its decision in *Twombly*, 550 U.S. at 570). To be plausible on its face, the claim must contain enough facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Supreme Court has identified "two working principles" for the district court to use in applying the facial plausibility standard. The first principle is that, in evaluating motions to dismiss, the court must assume the veracity of well-pled factual allegations; however, the court does not have to accept as true legal conclusions even when "couched as [] factual allegation[s]" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements." *Iqbal*, 556 U.S. at 678. The second principle is that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, under prong one, the court determines the factual allegations that are well-pled and assumes their veracity, and then proceeds, under prong two, to determine the claim's plausibility given the well-pled facts. That task is "context-specific" and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Id.* If the court determines that well-pled facts, accepted as true, do not state a claim that is plausible, the claim must be dismissed. *Id.*

### III. Discussion

As a preliminary matter, the court notes that several of Plaintiffs' claims rely on the existence of a series of contracts that Plaintiffs did not include with their complaint. If a district court considers materials not included alongside the complaint, the court usually must convert the motion to dismiss into a summary judgment motion. *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). But an exception exists. "In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Id.* Here, these contracts—attached to Defendant's briefing (Doc. 1 at Ex. B)—are the *sine qua non* of Plaintiffs' breach-of-contract claim, and because neither side questions the authenticity of these contracts, the court will properly consider them.

The court also notes that in Alabama, the statute of limitations to bring most contract claims is six years, and the statute of limitations to bring tort claims is two years. ALA. CODE §§ 6–2–38, 6-2-34 (1975). The most recent date on which Plaintiffs purchased insurance policies

from Defendant was May 1, 2015, which was about three years before Plaintiffs filed suit. (Doc. 1-3).

Although the statutes of limitations appear to time-bar almost all of Plaintiffs' claims, the court will not address the issue of statutes of limitations because the statutes do not begin to run until all the essential elements of each claim converge. *See, e.g., Utilities Bd. of City of Opp v. Shuler Bros.*, 138 So. 3d 287, 290 (Ala. 2013); *Rumford v. Valley Pest Control, Inc.*, 629 So. 2d 623, 627 (Ala. 1993). Rather than attempt to ascertain the chronological development of all essential elements for every claim, the court will instead address the facial sufficiency of each count pursuant to Rule 8 of the Federal Rules of Civil Procedure.

**Count One: Breach of Contract**

The series of insurance policies that Liberty National sold Mr. and Mrs. Padgett between 1972 and 2015 forms the basis of Plaintiffs' complaint. Mr. and Mrs. Padgett allege that they "substantially performed their obligations under the terms of the Policy . . . but have not received the benefit of the bargain." (Doc. 1-1 at 12.) But Plaintiffs' breach of contract claim does not follow. The standard breach of contract claim in the insurance context asserts that the insured, after paying premiums pursuant to a policy, made a claim under the policy that the insurance company refused to pay. Instead, Plaintiffs here allege that the 15 contracts created an overarching privity between the parties, notwithstanding any contractual provisions explicitly stated in any policy; Plaintiffs describe this privity as a "long-term relationship [in which] Plaintiffs' agent actively represented and agreed to act in the Plaintiffs' financial interests." (Doc. 40 at 10.)

A plaintiff alleging a breach of contract "must prove (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's

nonperformance, and (4) damages." *S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995). At first blush, the initial element appears to be uncontested in this case, as the parties agree to the existence of 15 valid insurance policies. But Plaintiffs do not bring this breach of contract claim based on any express provision of any of these 15 contracts. Plaintiffs essentially aver that the presence of these insurance policies animated some type of ongoing contractual relationship that sprawled beyond the four corners of any individual contract. Based on this putative contractual relationship, Plaintiffs contend, Defendant "fail[ed] to honor their agreement to act reasonably, prudently, and in the Plaintiff's financial interests by repeatedly soliciting, recommending and inducing them to purchase policies which were unnecessary." (Doc. 40 at 10–11.)

Plaintiffs mention three cases to support the assertion that the signed policies—that stated nothing about any ongoing relationship or action for the benefit of Plaintiffs—created an "agreement to utilize knowledge, skill and expertise to properly assess and recommend insurance products." (Doc. 40 at 9–10.) Plaintiffs initially point to *First Alabama Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1068 (11th Cir. 1990) for the proposition that "when one contracts with another and expressly promises to use due care or to do an act, he is liable in both tort and contract when his negligence injures another party." (Doc. 40 at 10.)

Plaintiffs correctly paraphrase Eleventh Circuit law, but the facts in *First Alabama* sharply diverge from those in the instant case. In *First Alabama*, the Eleventh Circuit examined the actions of insurance agents who violated the "*express terms* of the proposals," by not informing plaintiffs about the availability of a certain type of insurance when the agents had agreed in writing to do so. *First Alabama,* 899 F.2d at 1067 (emphasis added). Here, Plaintiffs present no such express written terms to support the extra-contractual obligations.

8

Moreover, in *Blumberg v. Touche Ross & Co.*, the second case Plaintiffs cite, the court considered an accounting firm's alleged breach of a written contract to review the plaintiff's financial reports. 514 So. 2d 922, 924 (Ala. 1987). Lastly, in *Eidson v. Johns-Ridout's Chapels, Inc.*, the Alabama Supreme Court contemplated whether a breached verbal promise to properly prepare a corpse prior to a family viewing was actionable at both contract and tort. 508 So. 2d 697, 701 (Ala. 1987) (*overruled on different grounds by McKenzie v. Killian*, 887 So. 2d 861 (Ala. 2004)).

In all three cases, the courts examined the alleged breach of an actual contractual agreement. Here, Plaintiffs do not allege that Defendants breached any provision of the 15 policies. The contractual terms state that Defendant would pay for any claim in the event of an insured's death, and Plaintiffs allege nothing to suggest that Defendant failed to perform regarding any of these contracts. Plaintiffs apparently never submitted a single claim under any of the 15 policies, even after the death of Mr. Padgett. Plaintiffs argue that the presence of multiple small contracts somehow spawned an ephemeral super contract that contained different, extra-contractual terms. The court finds no law to support this line of reasoning.

Because Plaintiffs articulate no cognizable theory under which this court could find that Defendant breached any actual contract, the court will GRANT Defendant's motion to dismiss count one (Doc. 3) and DISMISS Plaintiffs' breach of contract claim.

**Count Two: Good Faith and Fair Dealing**

Plaintiffs contend that Defendant breached its implied covenant of good faith and fair dealing in two ways. First, Liberty National sold policies that provided "no economic benefit" to the Padgetts; second, Liberty National recommended additional policies "without regard for the insured's needs." (Doc. 1-1 at 12.)

9

The elements of breach of implied covenant of good faith and fair dealing are (1) the existence of a valid contract and (2) a party's interference with the rights of another to receive the benefits of the contract. *Chavers v. Nat'l Sec. Fire & Cas. Co.*, 405 So. 2d 1, 4 (Ala. 1981). But if a plaintiff's breach of contract claim fails to allege a specific breach, an accompanying bad faith claim necessarily fails as well. In Alabama, "bad faith is not actionable absent an identifiable breach in the performance of specific terms of the contract . . . [and there exists] no contractual cause of action for breach of an implied duty of good faith that nebulously hovers over the contracting parties, free from the specific terms of the contract." *Lake Martin/Alabama Power Licensee Ass'n, Inc. v. Alabama Power Co.*, 601 So. 2d 942, 945 (Ala. 1992).

Here, the court has already dismissed Plaintiffs' contract claim for failure to allege a specific breach. Plaintiffs ask the court to find a nebulous cause of action that hovers outside each of the 15 agreements. The court cannot make this finding and must GRANT Defendant's motion to dismiss count two (Doc. 3) and DISMISS Plaintiffs' breach of an implied covenant of good faith and fair dealing claim.

**Count Three: Conversion**

Plaintiffs argue that Defendant converted the premium payments that the Plaintiffs paid pursuant to the 15 life insurance policies. Specifically, Plaintiffs assert that because the total amount of premiums they paid exceeded the death benefit of the policies, that Defendants "misappropriated or misapplied[] specific funds held in trust for the benefit of the Plaintiffs." (Doc. 1-1 at 13.)

A plaintiff who brings a conversion claim must show (1) defendant's wrongful taking of (2) plaintiff's specific property with (3) an assumption of ownership of that property. *McGee v. McGee*, 91 So. 3d 659, 667 (Ala. 2012). Under the second element, conversion claims regarding

money usually must relate to specific, identifiable currency, such as bagged coins or earmarked notes. *Lewis v. Fowler*, 479 So. 2d 725, 726 (Ala. 1985).

The Supreme Court of Alabama expressly held that unless a plaintiff can plausibly allege that a defendant insurance company withdraws and converts identifiable funds from a specific account, then a plaintiff cannot bring a conversion claim for the recovery of premium payments. *Willingham v. United Ins. Co. of Am.*, 628 So. 2d 328, 333 (Ala. 1993). Although Plaintiffs allege that Defendant "held in trust" the premium payments, Plaintiffs cite neither contractual provisions nor law to support a trust theory of conversion. Because Plaintiffs have not alleged that Defendant withdrew any identifiable money from a specific account, the court will GRANT Defendant's motion to dismiss count three (Doc. 3) and DISMISS Plaintiffs' conversion claim.

**Count Five: Unjust Enrichment**

To support their claim of unjust enrichment, Plaintiffs argue that "Liberty National received monies from Plaintiffs . . . in the form of revenues and profits from excess premiums that . . . must in equity and good conscience be returned to the Plaintiffs." (Doc. 1-1 at 15.)

A plaintiff who alleges unjust enrichment must show that the "defendant holds money which, in equity and good conscience, belongs to plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Hancock–Hazlett Gen. Constr. Co. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986).

Defendant contends that, because the relationship between the parties is governed by a series of contracts, then an unjust enrichment claim is precluded as a matter of law. *See Kennedy v. Polar-BEK & Baker Wildwood P'ship*, 682 So. 2d 443, 447 (Ala. 1996) ("[W]here an express contract exists between two parties, the law generally will not recognize an implied contract regarding the same subject matter.") *See also Gen. S. Indus., Inc. v. Shub*, 300 F. App'x 723,

729–30 (11th Cir. 2008) (holding that under Alabama law, unjust enrichment is not possible if the parties are bound by contract regarding the same issue.)

Defendant is correct. Plaintiffs base their demand for unjust enrichment relief on payments they made pursuant to clearly articulated contracts. Because these contracts subsume the same subject matter under which Plaintiffs seek unjust enrichment relief, the court will GRANT Defendant's motion to dismiss count five (Doc. 3) and DISMISS Plaintiffs' unjust enrichment claim.

**Count Seven: Negligence**

Plaintiffs allege that Defendant "owed duties to properly assess the Plaintiffs' needs . . . [and] failed to use reasonable care, skill and diligence to accurately assess and advise" Plaintiffs about the policies that Defendant offered for sale. (Doc. 1-1 at 18.)

A negligence claim must demonstrate "(1) duty, (2) breach of duty, (3) proximate cause, and (4) injury." *Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992). Regarding the first element, the only duty that the Padgetts allege relates to Liberty National agent Mr. Bice's supposed duty "to properly assess the Plaintiffs' needs and advise as to the suitability of the insurance policy recommended." (Doc. 1-1 at 18.) Although the Padgetts rely on *Highlands Underwriters Insurance v. Elegants Inns, Inc.*, 361 So. 2d 1060 (Ala. 1978) to support the contention that Mr. Bice owed Plaintiffs a duty to act in their best interests, the court cannot find any authority for the proposition that, unless a contractual provision creates a special duty, an insurance salesman owes any special duty to his clients.

In *Highland Underwriters*, the Supreme Court of Alabama held that "[o]nce the parties have come to an agreement on the procurement of insurance, the agent or broker must exercise reasonable skill, care, and diligence in effecting coverage." *Id.* at 1065. And, if the agent or

12

broker fails to uphold that duty, the insureds "may sue either for breach of the contract or, in tort, for breach of the duty imposed on the agent or broker." *Id.*

But *Highlands Underwriters* is not applicable here. As the Alabama Supreme Court noted, "[t]he problem with using *Highland Underwriters* is that it concerns a voluntary duty to *procure* requested insurance coverage, not a voluntary duty to advise clients about the adequacy of their insurance coverage." *Somnus Mattress Corp.*, 2018 WL 6715777, at *8.

The significant difference between *Highlands Underwriters* and the instant case is that *Highlands Underwriters* concerned an insurance broker who worked on behalf of the insured to procure insurance, not, as here, merely an insurance agent for the insurance company trying to sell policies to plaintiffs. As explained in this court's June 17 and July 25 Memorandum Opinions (Docs. 19, 35), Plaintiffs never argue that Mr. Bice—acting as an agent on behalf of Liberty National—failed to *procure* an insurance policy. (Doc. 19 at 9.) Plaintiffs instead contend somewhat of the opposite: that Mr. Bice procured for Plaintiffs too many policies that were expensive and unsuitable for their needs.
*Highlands Underwriters* is inapposite.

Because Plaintiffs do not plausibly allege that Liberty National breached any recognized duty, the court will GRANT Defendant's motion to dismiss count seven (Doc. 3) and DISMISS Plaintiffs' negligence claim.

**Count Eight: Negligent Training or Supervision**

Plaintiffs allege that Liberty National "was under duty to supervise the activities of its agents, including Mr. Bice. . . [and] allowed [Mr.] Bice to repeatedly solicit, recommend and induce plaintiffs" to purchase insurance policies that the Plaintiffs did not need. (Doc. 1-1 at 19.)

13

The elements of negligent training or supervision are an (1) employer's actual knowledge of (2) an employee's tortious conduct and (3) the employer's failure to take adequate steps to remedy the situation. *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999). But in Alabama, "underlying tortious conduct is a precondition to invoking successfully liability for the negligent or wanton training and supervision of an employee." *Jones Exp., Inc. v. Jackson*, 86 So. 3d 298, 304 (Ala. 2010). The court already dismissed Mr. Bice from the suit with prejudice. As a matter of law, because Mr. Bice committed no wrongdoing, Liberty National cannot be held liable for negligently training or supervising him. The court will GRANT Defendant's motion to dismiss count eight (Doc. 3) and DISMISS Plaintiffs' negligent training or supervision claim.

**IV. Conclusion**

Plaintiffs assert that "[i]t is an unfair, unlawful and deceptive practice for an insurer to provide life insurance coverage on any person unless the benefit payable under such policy will equal or exceed the cumulative premiums." (Doc. 1-1 at 2.) But the insurance company bears the risk that the insured will die and the company will have to pay the face amount of the policy up to the point where the cumulative premiums exceed the face amount of the policy. The insurance company assumes an increased risk in the early years of a life insurance policy so that, as the policyholder ages past the so-called "break-even point," the policyholder subsidizes the increased risk that comes from the insurance company's younger clients, who may die before they pay sufficient premiums to cover the face amount. For both parties, life insurance is a gamble.

Plaintiffs do not dispute that—going back to 1972—each policy plainly stated the premium amounts, payment schedules, and accompanying death benefits. Plaintiffs cannot now

allege a cause of action merely because they lost their perverse bet and lived well into their eighties, still paying premiums on their policies. Accordingly, the court will GRANT Defendant's motion to dismiss all counts (Doc. 3) and DISMISS the case in its entirety with prejudice.

The court will enter a separate Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 30th day of September, 2019.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE